IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROBIN L. TYLER,                                No. C 06-3056 CW

       Plaintiff,                           ORDER DENYING
                                               PLAINTIFF'S
    v.                                       MOTION FOR
                                               SUMMARY JUDGMENT
JO ANNE B. BARNHART, Commissioner,             AND GRANTING
Social Security Administration,                DEFENDANT'S
                                               CROSS-MOTION FOR
       Defendant.                           SUMMARY JUDGMENT

_____/

    Plaintiff Robin L. Tyler has filed a motion for summary
judgment.  Defendant Jo Anne Barnhart, in her capacity as
Commissioner of the Social Security Administration (SSA), opposes
the motion and cross-moves for summary judgment.  Having
considered all of the papers filed by the parties, the Court
DENIES Plaintiff's motion for summary judgment and GRANTS
Defendant's cross-motion for summary judgment.

BACKGROUND

    On May 2, 2001, Plaintiff filed an application for
Disability Insurance Benefits under Title II of the Social
Security Act (the Act).  Plaintiff alleges that she became
disabled on July 14, 1999, due to carpal tunnel syndrome,
bilateral repetitive motion syndrome in both upper extremities
because of ulnar nerve damage and depression.  On September 4,
2001, her claim was denied for lack of a disability.  Plaintiff
filed for reconsideration, which was denied on November 30, 2001.
Plaintiff then requested a hearing before an Administrative Law

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Judge (ALJ), which took place on April 25, 2002.  Plaintiff appeared and was represented by counsel.  On September 23, 2002, the ALJ issued an opinion finding that Plaintiff was not disabled within the meaning of the Act because she could perform a full range of light or sedentary work.

On November 2, 2002, Plaintiff filed a timely request with the Appeals Council for review of the ALJ's decision, arguing that it contained legal errors and was not supported by substantial evidence.  On May 13, 2004, the Appeals Council remanded the case to the ALJ for the purpose of: (1) further evaluating Plaintiff's mental impairment, (2) further evaluating the testimony of Plaintiff's husband and providing germane reasons for the weight given to his testimony, (3) obtaining supplemental evidence from a vocational expert (VE) if warranted, and (4) preparing an Exhibit List.

Plaintiff's second hearing before the ALJ occurred on January 26, 2005.  Plaintiff was represented by counsel, and both Plaintiff and her husband testified.  A VE also testified.  On April 4, 2005, the ALJ issued an opinion in which he found that Plaintiff was "not disabled" as defined in the Act and applicable regulations.  Plaintiff again filed a timely request with the Appeals Council for review of the ALJ's decision, alleging that the ALJ's evaluation of the testimony of Plaintiff's husband was insufficient, and that her mental impairment was severe.  On March 14, 2006, the request for review was denied.  On May 5, 2006, Plaintiff initiated the instant action for judicial review under 42 U.S.C. § 405(g), seeking remand to the Commissioner for a new hearing.

STATEMENT OF FACTS

I.   Plaintiff's Education and Work Experience

Plaintiff was born in San Francisco, California on December 25, 1961.  (Transcript (Tr.) 243, 68.)  She graduated from Novato High School in 1980.  (Tr. 119.)  After a brief stint as an executive secretary, Plaintiff worked for seventeen years as a legal secretary for law firms and solo practitioners.  Id.  She was able to type 90-100 words per minute during this period.  Id. According to Plaintiff, the medical problems with her hands began in 1998 when she started using a computer mouse on a regular basis at her last legal secretary position.  (Tr. 119.)

II.   Plaintiff's Medical History

On September 2, 1998, Plaintiff underwent an orthopedic medical evaluation at the Gordon-Bickel Hand Clinic.  (Tr. 159.) She was diagnosed with carpal tunnel syndrome on her right side. (Tr. 161.)  The examining physician, Dr. Leonard Gordon, concluded that the carpal tunnel syndrome was likely caused by Plaintiff's frequent use of a computer mouse at work.  Id.  Dr. Gordon recommended the use of an ergonomic mouse, and noted that surgery might become necessary.  Id.

Plaintiff also sought treatment for the pain in her hands at the Hill Park Clinic.  (Tr. 3.)  She visited the clinic ten times between January and April, 1999.  (Tr. 163-73.)  The clinic diagnosed her with wrist tendonitis, cervical strain, and somatic dysfunction.  Id.  It is not clear whether Plaintiff's treatment during this period significantly alleviated her pain and discomfort.  After a period of temporary disability, Plaintiff returned to work on a part-time basis, working approximately four

3

United States District Court
For the Northern District of California

hours per day.  (Tr. 261.)

On September 7, 1999, Plaintiff underwent surgery in the Sonoma Valley Hospital District for right carpal tunnel syndrome and right ulnar tunnel syndrome.  (Tr. 175.)  The procedures performed included a right open carpal tunnel release, and a right open ulnar nerve decompression.  Id.  Dr. Noah Weiss performed the surgery.  Id.  In the six months following her surgery, Plaintiff completed sixty-one occupational therapy visits with the goal of physically rehabilitating her right hand. (Tr. 203.)  Though eventually discharged, Plaintiff continued to complain of pain in her hand, and the clinic discharge summary noted that her overall response to treatment was "fair."[1]  Id.

Plaintiff regularly visited Dr. Weiss in the months following her surgery.  (Tr. 249-82.)  His medical records note slow improvement in her right hand, but increasing problems with her left hand.  (Tr. 267.)  On September 28, 2000, Dr. Weiss conducted a comprehensive "permanent and stationary" evaluation[2] of Plaintiff on behalf of the State Compensation Insurance Fund. (Tr. 260.)  He stated that Plaintiff's nerve conduction studies had returned to normal and that she had recovered good range of motion, but that she had lost approximately twenty-five percent of her pre-injury capacity for lifting, pushing, pulling, and other activities requiring comparable physical effort.  (Tr.

_____

[1]The clinic discharge summary sheet gives four options for assessing the patient's overall response to treatment: poor, fair, good, and excellent.  (Tr. 175.)

[2]According to Dr. Weiss, this evaluation addressed "the issues of causation, permanent disability, work restrictions, apportionment and future medical treatment."  (Tr. 260.)

4

United States District Court
For the Northern District of California

264.)

During Dr. Weiss' examination on October 2, 2000, Plaintiff reported pain in her hands despite working only two hours a day. Id.  In his report of that examination, Dr. Weiss stated that his examination "indicated a normal neurological examination with no evidence of ongoing carpal tunnel syndrome or ulnar tunnel syndrome."  Id.  Dr. Weiss said that he could not explain the deterioration of Plaintiff's symptoms, and stated that it was "inconceivable" to him that Plaintiff's two hours of work per day could cause such marked deterioration in function and increase in subjective complaints.  (Tr. 258.)  He doubted that the grip strengths obtained from Plaintiff during her examination on October 2 were of maximal effort, and felt that her current work restrictions were adequate.  Id.  Furthermore, Dr. Weiss stated that "it is my impression that there is most likely a strong psychiatric component to Ms. Tyler's complaints."  Id.

On January 10, 2001, Dr. Weiss referred Plaintiff to another orthopaedic surgeon, Dr. Jerry L. Roberts, for a second medical opinion.  (Tr. 256.)  On February 1, 2001, Plaintiff was examined by Dr. Roberts.  (Tr. 228.)  In a letter to the State Compensation Insurance Fund regarding that examination, Dr. Roberts concluded that bilateral repetitive motion syndrome continued to exist in both upper extremities.  (Tr. 232.)  The post-operative right carpal tunnel and right ulnar release showed no improvement, and Plaintiff's ability to grip was limited by pain and lack of strength.  (Tr. 231-32.)  Dr. Roberts pointed to both objective and subjective factors of disability.  (Tr. 233.)  Objectively, Dr. Roberts noted tremendous loss of grip strength

United States District Court

For the Northern District of California

1  and positive Tinel's sign[3] over the median and ulnar nerves
2  bilaterally over the volar aspect of the wrist.  Id.
3  Subjectively, he concluded that Plaintiff's symptoms prevented
4  her from doing anything with her hands.  Id.  Dr. Roberts
5  concluded that Plaintiff was ninety percent disabled from any
6  meaningful work activities involving her upper extremities.  Id.

7       Plaintiff returned to Dr. Weiss for a follow up appointment
8  on March 15, 2001.  (Tr. 255.)  According to his medical records,
9  Dr. Weiss completely concurred with Dr. Roberts' findings.  Id.
10 It was his belief at this point that Plaintiff suffered from
11 bilateral repetitive motion syndrome of the upper extremities,
12 and he concurred with Dr. Roberts' objective and subjective
13 findings of disability, as well as his assessment of her overall
14 level of disability.  Id.  Drs. Weiss and Roberts both concluded
15 that Plaintiff's disability was permanent and stationary, meaning
16 that further medical care would not provide relief.  Id.  In a
17 letter dated April 3, 2001, Dr. Weiss confirmed this assessment
18 and stated that he considered Dr. Roberts' opinion "to be my
19 own."  (Tr. 253.)

20 On June 26, 2001, Plaintiff underwent a residual functional
21 capacity (RFC) assessment by Disability Determination Services
22 (DDS).  (Tr. 235.)  Plaintiff's RFC assessment concluded that she
23 could lift twenty pounds occasionally, ten pounds frequently,
24 could stand and/or walk for six hours in an eight hour work day,

25

26      [3]Tinel's sign is a sensation of tingling felt at a lesion
27 site or along the course of a nerve when the latter is percussed
   (i.e. lightly banged).  Stedman's Medical Dictionary, 1640 (27th
28 ed. 2000) (Stedman's).

United States District Court

For the Northern District of California

and had frequent but not constant limitations in her upper
extremities.  (Tr. 236.)  The assessors disagreed with the
findings of Drs. Weiss and Roberts, asserting that those doctors'
diagnoses were mainly based on subjective factors and not
objective findings.  (Tr. 241-42.)  A second RFC assessment
performed on November 27, 2001, reached the same conclusions.

On August 19, 2001, Dr. Asha Prabhu, a psychiatrist,
performed a comprehensive psychiatric evaluation of Plaintiff on
behalf of DDS.  (Tr. 243.)  The report noted that Plaintiff's
mood was depressed, but that her prognosis was good and would
likely improve over the coming year.  (Tr. 244-45.)
Functionally, Dr. Prabhu found that Plaintiff could perform
simple and repetitive tasks, interact appropriately with
supervisors and co-workers, and could perform in the workplace
without psychiatric problems.  (Tr. 245.)

On December 14, 2001, Dr. Weiss sent a letter to the State
Compensation Insurance Fund regarding Plaintiff's disability
status.  (Tr. 313.)  In that letter, Dr. Weiss confirmed
Plaintiff's diagnosis of bilateral repetitive motion syndrome of
the upper extremities.  Id.  Dr. Weiss cited both subjective and
objective factors of disability.  (Tr. 313-14.)  Subjectively,
Dr. Weiss characterized Plaintiff's complaints as "slight in
intensity on a frequent basis, increasing to moderate on an
intermittent basis.  Her pain is aggravated with most activities
of the upper extremities."  (Tr. 313.)  Objectively, Dr. Weiss
noted that Plaintiff lost about two-thirds of anticipated grip
strength in the upper extremities, had tenderness in her
forearms, and maintained positive Tinel's sign over the median

7

United States District Court
For the Northern District of California

1    and ulnar nerves bilaterally.  (Tr. 314.)  In assessing
2    Plaintiff's work restrictions, Dr. Weiss maintained that she was
3    restricted from lifting more than five pounds with either upper
4    extremity, but felt that she could do light grasping and other
5    similar activities.  Id.  He felt that she was not capable of
6    keyboarding for more than ten to fifteen minutes at a time
7    without a significant break.  Id.

8        One week later, in response to a specific follow-up question
9    posed by the State Compensation Insurance Fund, Dr. Weiss stated
10   that it was his belief that Plaintiff was medically able to
11   pursue the vocational goal of freelance candle and home accessory
12   sales.  (Tr. 315.)

13       On April 24, 2002, Dr. Weiss completed a chronic pain RFC
14   questionnaire about Plaintiff for the SSA.  (Tr. 316.)  In
15   addition to reiterating many of the aforementioned symptoms and
16   assessments, Dr. Weiss expressed his belief that Plaintiff was
17   not malingering, and that emotional factors did not contribute to
18   the severity of her symptoms and functional limitations.  Id.
19   Dr. Weiss expressed concern over the deterioration of Plaintiff's
20   symptoms and recommended a repeat electrodiagnostic[4] study of her
21   upper extremities.  (Tr. 382.)

22       On October 3, 2002, Dr. Kevin Satow performed an
23   electrodiagnostic evaluation of Plaintiff.  (Tr. 371.)  The
24   results were normal save for (mild) bilateral ulnar entrapments
25   across the elbow.  (Tr. 372.)

26

27       [4]Electrodiagnosis is used to determine the nature of a
     disease through observation of changes in electrical activity.
28   Stedman's 575.

8

United States District Court

For the Northern District of California

1    On August 28, 2003, on behalf of the State Compensation
2 Insurance Fund, Plaintiff was examined by Dr. James R. Doyle.
3 (Tr. 384.)  Dr. Doyle concluded that Plaintiff's disability
4 remained stable, that she was precluded from forceful gripping or
5 pinching, and that he could not "find any objective basis for
6 precluding her from working as a legal secretary."  (Tr. 387.)

7    On September 3, 2003, Plaintiff was referred by her attorney
8 to Dr. Helmer W. S. Huseby for a medical evaluation.  (Tr. 389.)
9 After reviewing the records and conducting a physical
10 examination, Dr. Huseby concluded that Plaintiff suffered from
11 bilateral thoracic outlet syndrome,[5] a new diagnosis.  (Tr. 392.)
12 He cited both objective and subjective evidence for this finding.
13 (Tr. 393.)  Dr. Huseby concluded that Plaintiff was precluded
14 from engaging in work involving repetitive handling of a mouse,
15 the use of her hands at or above shoulder level, and repetitive
16 keyboarding work, and that lifting should be consigned to under
17 ten pounds on an occasional and non-repetitive basis.  (Tr. 393-
18 94.)  A second opinion by Dr. David L. Nelson on April 1, 2004,
19 likewise concluded that Plaintiff suffered from thoracic outlet
20 syndrome.  (Tr. 402.)  Dr. Nelson stated that he had "never seen
21 a patient who has such flagrant thoracic outlet syndrome in my
22 life."  Id.

23    From mid-August until November 26, 2003, Plaintiff visited
24 Kaiser Permanente Hospital on eleven occasions for treatment for

25

26    [5]Thoracic outlet syndrome is a collective title for a number
27 of conditions attributed to the compromise of blood vessels or
nerve fibers at any point between the base of the neck and the
28 axilla.  Stedman's 1769.

United States District Court

For the Northern District of California

depression, sleep disorder, and viral syndrome.  (Tr. 405-415.)
Hospital records indicate that different combinations of anti-
depression drugs were prescribed for Plaintiff with each visit.
Id.

On September 8, 2004, DDS conducted a neurological
consultative examination of Plaintiff.  (Tr. 484.)  The examining
neurologist, Dr. Edward L. Spencer, concluded that Plaintiff had
good musculature, full range of motion of the extremities,
positive Waddell signs[6] when testing the right grip, minimal
evidence of right carpal tunnel syndrome, and mild slowing of the
ulnar nerve across the elbow.  (Tr. 486.)  Dr. Spencer stated
that Plaintiff's complaints were subjective and "other than the
physical findings would suggest."  Id.  In Dr. Spencer's opinion,
Plaintiff could lift twenty-five pounds occasionally, ten pounds
frequently, and had the unlimited ability to reach in all
directions (including overhead) and handle items.  (Tr. 487-89.)

On September 21, 2004, Plaintiff was examined once more by
Dr. Nelson.  (Tr. 520.)  In a letter to the State Compensation
Insurance Fund concerning that examination, Dr. Nelson reported
that Plaintiff still had long-standing thoracic outlet syndrome
but was doing somewhat better.  (Tr. 521.)  Dr. Nelson expressed
the hope that proper treatment with the Edgelow Technique would
have a positive effect on Plaintiff, and implored the insurance

---

[6]Waddell signs identify non-organic, non-structural causes
of pain.  P. Douglas Kiester, M.D., & Alexandra Duke, M.D., Is it
Malingering or is it Real?, Postgraduate Medicine, Vol. 106 No.
7, December 1999.  Although Waddell signs seem to indicate
underlying behavioral causes for the pain, it is not clear
whether they are definitive proof of malingering.

United States District Court

For the Northern District of California

1  company to fund such treatment.   Id.

2       On November 15, 2004, Plaintiff underwent the last physical

3  examination she would receive before her second ALJ hearing.

4  (Tr. 537.)  She was examined by Dr. David L. Kneapler, who was

5  the approved medical examiner (AME) in Plaintiff's ongoing

6  workers compensation claim.   Id.   Dr. Kneapler found that

7  Plaintiff suffered from progressive ulnar nerve damage in both

8  elbows and median nerve damage in the carpal tunnels.  (Tr. 541.)

9  However, Dr. Kneapler professed concern about Plaintiff's "over

10  representation" of her complaints.   Id.   He also disagreed with

11  the diagnosis of thoracic outlet syndrome.   Id.   Dr. Kneapler

12  found no definitive evidence of thoracic outlet syndrome, and

13  considered Plaintiff's injuries as instead reflecting multiple

14  nerve entrapments and cervical spine disc damage.  (Tr. 542.)  He

15  recommended repeat electrodiagnostic studies and possibly further

16  surgery.  (Tr. 543.)

17  III. Plaintiff's Testimony

18       On January 26, 2005, at the second ALJ hearing, Plaintiff,

19  who was represented by counsel, was the first witness.

20  Additional witnesses included Jeffrey Tyler, Plaintiff's husband,

21  and Steven Davis, a VE.  Plaintiff testified that the pain in her

22  hands was like "somebody has flames underneath my wrist" and

23  stated that she could not feel the top portion of her pinky

24  finger.  (Tr. 576-77.)  She said that her fingers would start

25  tingling, and then go numb.  (Tr. 578.)

26       In describing her capabilities around the house, Plaintiff

27  stated that she could only prepare meals with the help of her

28  children, that she could dust if she did not pick up and move

11

United States District Court

For the Northern District of California

items, and that she was unable to vacuum or scrub the floor.
(Tr. 594.) Doing laundry for the family took "all day." (Id.)
She testified that it takes her two or three hours to get ready
in the morning because of her hand problems, and that she no
longer wears anything with buttons or laces. (Tr. 596-97.) She
could drive for about half an hour before it started bothering
her hands. (Tr. 603.) Plaintiff said that she was taking
antitryptaline, topomax, and effexor for her pain. (Tr. 602.)

Plaintiff testified that she was depressed and tearful
during the week. (Tr. 606-07.) She also stated that she was not
currently seeing anyone to treat her depression. (Tr. 611-12.)
However, she said that she had taken Wellbutrin and Prozac to
treat her depression in the past. (Tr. 564.)

Plaintiff's husband testified without her present in the
room. (Tr. 612.) He said that she was demoralized, that her
moods varied starkly between happiness and depression, and that
the depression was getting worse. (Tr. 614-15.) Mr. Tyler
testified that he "didn't see any benefit" from psychological
counseling, but suggested to Plaintiff that she keep "trying."
(Tr. 622.) He noted that Plaintiff felt that counseling was not
"working." Id. He acknowledged that the co-payment at Kaiser
for each counseling session was not cost-prohibitive. (Tr. 621.)

In describing Plaintiff's physical limitations, Mr. Tyler
stated that she walks regularly with one of her friends, although
he noted that her legs and hands recently started going numb
during these walks. (Tr. 617.) He testified that she could
still type, but only for four or five minutes before it became
too physically taxing. (Tr. 619.) He said that she could not

United States District Court
For the Northern District of California

pick up anything in excess of two pounds for more than a few seconds, that she has dropped plates and other items, and that she was incapable of ironing. (Tr. 623.) Mr. Tyler stated that it was difficult when they went out to dinner because the chairs at restaurants were not designed for people with arm impairments. (Tr. 625.) He also testified that Plaintiff's previous occupation selling homemade candles was too physically burdensome because of the traveling and carrying the candle tray. (Tr. 627.)

In response to questioning from the ALJ, Mr. Tyler stated that he and Plaintiff occasionally went out to dinner, that she could eat on her own (with the exception of cutting steak), and that she participated in the children's school activities. (Tr. 629-30.)

The final testifying witness was Steven Davis, the VE. He testified that he reviewed the vocational portion of the record and listened to all the testimony presented at the hearing. (Tr. 633.) The ALJ asked him to discuss employment opportunities for someone of Plaintiff's age, vocational and educational background who was unable to lift more than five pounds, could not grasp, and could only occasionally reach or engage in overhead work. (Tr. 636-37.) In response, Mr. Davis offered information clerk, case aide and food management aide as employment options. (Tr. 637-38.) Gate guard was added to the list in response to a question by the ALJ. (Tr. 639.) However, Mr. Davis added an erosion factor of fifty percent to these positions because of the possibility that they would require up to six pounds of lifting. (Tr. 638.)

United States District Court
For the Northern District of California

1    The VE also testified that restricting lifting to only one

2  or two pounds and adding a mild to moderate concentration

3  impairment would substantially erode those positions even

4  further, to the point of eliminating the information clerk

5  position from the list altogether.  (Tr. 639-40.)  The erosion

6  factor for the remaining positions was eighty-five percent for

7  case aide, eighty percent for food management aide, and seventy

8  percent for gate guard.  (Tr. 644.)  Applying these erosion

9  factors to the VE's testimony of the total number of jobs in

10  California, it appears that Plaintiff is eligible for 3,075 case

11  aide, 3,000 food management aide, and 7,200 gate guard positions

12  in California.

13  IV.  The ALJ's Findings

14    In his decision, the ALJ found that Plaintiff had not

15  engaged in substantial gainful activity since the alleged onset

16  of her disability.  (Tr. 30.)  He found that Plaintiff's right

17  hand carpal tunnel and bilateral hand repetitive motion syndrome

18  were severe impairments, that Plaintiff might have thoracic

19  outlet syndrome, and that she did not have a severe mental

20  impairment.  Id.  The ALJ found that Plaintiff's medically

21  determinable impairments did not meet or medically equal any one

22  of the listed impairments in Appendix 1, Subpart P, Regulation

23  No. 4.  Id.  He found that her allegations regarding her

24  limitations were not persuasive for a finding of disability.  Id.

25  The ALJ considered all of the medical records and found that,

26  although Plaintiff could not perform any of her past work, she

27  had the RFC to perform a narrow range of light work.  Id.

28  Finally, based on the testimony of the VE, the ALJ found that,

United States District Court
For the Northern District of California

although Plaintiff's limitations did not allow her to perform the
full range of light or sedentary work,[7] there was a significant
number of jobs in the national economy that she could perform.
(Tr. 32.)   Thus, Plaintiff was not disabled.   Id.

LEGAL STANDARD

I.   Overturning a Denial of Benefits

A court cannot set aside a denial of benefits unless the
ALJ's findings are based upon legal error or are not supported by
substantial evidence in the record as a whole.   42 U.S.C.
§ 405(g); Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989);
Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).
Substantial evidence is such relevant evidence as a reasonable
mind might accept as adequate to support a conclusion.
Richardson v. Perales, 402 U.S. 389, 401 (1971); Orteza v.
Shalala, 50 F.3d 748, 749 (9th Cir. 1995).   It is more than a
scintilla but less than a preponderance.   Sorenson v. Weinberger,
514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

To determine whether substantial evidence exists to support
the ALJ's decision, a court reviews the record as a whole, not
just the evidence supporting the decision of the ALJ.   Walker v.
Matthews, 546 F.2d 814, 818 (9th Cir. 1976).   A court may not
affirm the ALJ's decision simply by isolating a specific quantum
of supporting evidence.   Hammock v. Bowen, 879 F.2d 498, 501 (9th

---

[7]Sedentary work involves lifting no more than ten pounds at
a time and occasionally lifting or carrying articles like docket
files, ledgers, and small tools.   20 CFR § 404.1567(a).   Light
work involves lifting no more than twenty pounds at a time with
frequent lifting or carrying of objects weighing up to ten
pounds.   20 CFR § 404.1567(b).

United States District Court

For the Northern District of California

1  Cir. 1989).   In short, a court must weigh the evidence that

2  supports the ALJ's conclusions and that which does not.

3  Martinez, 807 F.2d at 772.

4       If there is substantial evidence to support the decision of

5  the ALJ, even when the evidence is susceptible to more than one

6  rational interpretation, it is well-settled that the decision

7  must be upheld.   Gallant v. Heckler, 753 F.2d 1450, 1453 (9th

8  Cir. 1984).   If supported by substantial evidence, the findings

9  of the ALJ as to any fact will be conclusive.   42 U.S.C.

10 § 405(g).

11 II.   Establishing Disability Under the Social Security Act

12      Under the Social Security Act, "disability" is defined as

13 the inability to engage in any substantial gainful activity by

14 reason of any medically determinable physical or mental

15 impairment which can be expected to result in death or which has

16 lasted or can be expected to last for a continuous period of not

17 less than twelve months.   42 U.S.C. § 423 (d)(1)(A).   The

18 impairment must be so severe that the claimant "is not only

19 unable to do his previous work but cannot . . . engage in any

20 other kind of substantial gainful work which exists in the

21 national economy."   42 U.S.C. § 423(d)(2)(A).   In addition, the

22 impairment must result "from anatomical, physiological, or

23 psychological abnormalities which are demonstrable by medically

24 acceptable clinical and laboratory diagnostic techniques."

25 42 U.S.C. § 423(d)(3).

26      To determine whether a claimant is disabled within the

27 meaning of the Social Security Act, the Social Security

28 Regulations set out a five-step sequential process.   20 C.F.R.

16

1  § 404.1520 (b)-(f); <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th

2  Cir. 1991).  The burden of proof is on the claimant in steps one

3  through four.  <u>Sanchez v. Secretary of Health and Human Servs.</u>,

4  812 F.2d 509, 511 (9th Cir. 1987).  In step one, the claimant

5  must show that he or she is not currently engaged in substantial

6  gainful activity.  20 C.F.R. § 404.1520(b).  In step two, the

7  claimant must show that he or she has a "medically severe

8  impairment or combination of impairments" that significantly

9  limits his or her ability to work.  20 C.F.R. § 404.1520(c);

10 <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Smolen v. Chater</u>, 80

11 F.3d 1273, 1290 (9th Cir. 1996).  If the claimant does not, he or

12 she is not disabled.  Otherwise, the process continues to step

13 three for a determination of whether the impairment meets or

14 equals a "listed" impairment which the regulations acknowledge to

15 be so severe as to preclude substantial gainful activity.

16 <u>Yuckert</u>, 482 U.S. at 141; 20 C.F.R. § 404.1520(d); 20 C.F.R.

17 § 404, Subpt. P, App. 1.  If this requirement is met, the

18 claimant is conclusively presumed disabled; if not, the

19 evaluation proceeds to step four.  At step four, it must be

20 determined whether the claimant can still perform "past relevant

21 work."  <u>Yuckert</u>, 482 U.S. at 141; 20 C.F.R. § 404.1520(e).  If

22 the claimant can perform such work, he or she is not disabled.

23 If the claimant meets the burden of establishing an inability to

24 perform prior work, the burden of proof shifts to the

25 Commissioner for step five.  At step five, the Commissioner must

26 show that the claimant can perform other substantial gainful work

27 that exists in the national economy.  <u>Yuckert</u>, 482 U.S. at 142;

28 20 C.F.R. § 1520(g).

United States District Court

For the Northern District of California

DISCUSSION

I.   Prior Remand Order of the Appeals Council

Plaintiff argues that the Appeals Council committed legal error by not discussing whether the ALJ followed its initial remand order, which Plaintiff avers was the "law of the case." The Commissioner contends that the Appeals Council was not legally obliged to discuss its remand order because (1) the remand order was not a final decision by the Commissioner, and (2) the "law of the case" doctrine does not apply to administrative proceedings.

If the Appeals Council grants a request for review, it will either make a decision or remand the case to the ALJ.  20 CFR § 404.979.  It may remand a case in which additional evidence is needed or additional action by the ALJ is required.  20 CFR § 404.977.  A plaintiff may appeal in federal district court only if the Appeals Council either denies the request for review, or issues an unfavorable decision, because those actions are final and binding.  20 CFR § 404.981; 42 U.S.C. § 405(g).

The initial remand order issued by the Appeals Council on May 13, 2004 was not a final decision by the Commissioner, and therefore this Court lacks jurisdiction to review that order. 42 U.S.C. § 405(g).  This Court has jurisdiction only to consider the Appeals Council's denial of Plaintiff's request for review of the second ALJ decision.  Id.  The "law of the case" doctrine applies is not applicable.

Under the "law of the case" doctrine, "a court is generally precluded from reconsidering an issue that has already been

decided by the same court, or a higher court in the identical case." Thomas v. Bible, 983 F.2d 152, 154 (9th Cir. 1993). In the Social Security context, neither the Appeals Council nor the ALJ can re-decide an issue that was decided in remand orders from the district court. Ischay v. Barnhart, 383 F. Supp. 2d 1199, 1215 (C.D. Cal. 2005). This case does not involve a remand order from the district court, but rather a remand order from the Appeals Council itself. The remand order did not decide any legal or factual issues. Instead, it remanded for the ALJ to make specific findings, provide germane reasons, and obtain supplemental evidence as necessary. (Tr. 340-41.) Accordingly, the "law of the case" doctrine does not require this Court to consider whether the initial remand order was followed.

II.  Plaintiff's Husband's Credibility

Plaintiff argues that the ALJ's determination of her husband's credibility failed to meet the standard of SSR 96-7p and thus was legally erroneous.

In a claim for disability benefits, the ALJ may consider observations by "non-medical sources" as evidence of the claimant's impairment. 20 C.F.R. § 404.1513(d)(4). Lay witness testimony by friends, neighbors, and family members in a position to observe the claimant's symptoms is competent evidence. Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). "Disregard of this evidence violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." Id.; 20 C.F.R. § 404.1513(e)(2). The ALJ can reject the testimony of lay

United States District Court

For the Northern District of California

1  witnesses only if he or she gives reasons germane to each witness

2  whose testimony is rejected.  Smolen, 80 F.3d at 1288.

3      The ALJ adequately summarized Mr. Tyler's testimony in his

4  opinion.  (Tr. 27.)  With the apparent exception of Mr. Tyler's

5  characterization of Plaintiff's depression as "getting worse,"

6  the ALJ did not reject his testimony, but explained that it

7  supported his finding that Plaintiff's mental impairment was not

8  severe and that she had the RFC to perform a narrow range of

9  light and/or sedentary work.  (Tr. 28.)  He pointed out the

10  numerous activities that Mr. Tyler acknowledged that Plaintiff

11  still performed.  Id.  These included light cooking and

12  housework, involvement with the school activities of her

13  children, regular walks with her friends, and occasional social

14  activities.  Id.  The ALJ considered this testimony as evidence

15  that Plaintiff was not severely depressed and could perform work

16  "at the modified light exertional level."  Id.  The Court finds

17  that Mr. Tyler's testimony about the specific daily activities

18  Plaintiff performed is a germane reason for not accepting Mr.

19  Tyler's general characterization of Plaintiff's depression as

20  "getting worse."

21      Plaintiff correctly notes that Mr. Tyler's testimony from

22  the first administrative hearing was not included in the record

23  before this Court.  According to the Appeals Council's remand

24  order, at the first hearing Mr. Tyler testified that Plaintiff

25  was unable to load the dishwasher and complained of fatigue,

26  irritability, and lack of alertness.  (Tr. 340.)  Nonetheless,

27  Mr. Tyler's testimony appears to have been substantially similar

28  in the two hearings, and the ALJ "adopted and incorporated by

United States District Court

For the Northern District of California

1  reference" evidence from the first hearing (Tr. 22.).

2  Accordingly, the ALJ's assessment of Mr. Tyler's credibility was

3  legally sufficient.

4  III. Plaintiff's Mental Impairment

5      Plaintiff argues that she suffers from depression and that

6  in his second opinion, the ALJ did not incorporate evidence of

7  her mental impairment from the first hearing, did not use the

8  statutorily prescribed special technique for evaluating the

9  severity of her mental impairment, did not consider Plaintiff's

10 husband's testimony concerning her depression, did not analyze

11 certain medical findings relevant to her ability to work, and did

12 not rate the degree of functional loss resulting from her

13 impairment in areas deemed essential for work.

14     At every level in the administrative review process, the

15 regulations require a special technique to evaluate the possible

16 mental impairment of applicants.  20 CFR § 404.1520a(b)(1).

17 First, the pertinent symptoms, signs and laboratory findings are

18 evaluated to determine whether there is a medically determinable

19 mental impairment.  Id.  If it is determined that a medically

20 identifiable impairment exists, the symptoms, signs and

21 laboratory findings that substantiate the presence of the

22 impairment are specified and documented for use during the

23 administrative review process.  Id.  Second, the degree of

24 functional limitation resulting from the impairment is rated.  20

25 CFR § 404.1520a(b)(2).  Functional limitation is rated in four

26 broad functional areas: activities of daily living; social

27 functioning; concentration, persistence, or pace; and episodes of

28

decompensation.[8]   20 CFR § 404.1520a(c)(3).   The regulations rate the degree of limitation in the first three functional areas using the following five-point scale: none, mild, moderate, marked, and extreme.   20 CFR § 404.1520a(c)(4).   The regulations rate the degree of limitation in the fourth functional area (episodes of decompensation) using the following four-point scale: none, one or two, three, four or more.   Id.  The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.   Id.

A mental impairment may be found not severe when it is only a "slight abnormality" that has "no more than a minimal effect" on a plaintiff's ability to perform basic work.   Bowen, 482 U.S. at 153.

In evaluating the signs, symptoms, and laboratory findings of mental impairment in his second opinion, the ALJ first adopted and incorporated by reference the medical evidence from his prior decision.   (Tr. 22.)   In his first decision, the ALJ had cited Dr. Prabhu's observation that Plaintiff's memory and concentration were intact notwithstanding her depression.   (Tr. 327.)   In his second opinion, the ALJ referred to Dr. Catlett's diagnosis of "reactive depression," and mentioned Plaintiff's adverse reactions to the anti-depressants that he prescribed during her treatment at Kaiser.   (Tr. 23.)   He also discussed both Plaintiff's and her husband's testimony that she is

---

[8]Decompensation is "the appearance or exacerbation of a mental disorder due to failure of defense mechanisms."   Stedman's 462.

United States District Court

For the Northern District of California

depressed.  (Tr. 27.)  The ALJ found that their characterization of the degree of Plaintiff's depression was inconsistent with the objective evidence and undermined by their testimony about the extent of Plaintiff's daily living and social activities.  (Tr. 29.)  The ALJ also doubted Plaintiff's testimony because she "was vague about needing help or seeking help" for her depression. (Tr. 28.)

Based on these factors, the ALJ concluded that Plaintiff did not have a severe mental impairment.  (Tr. 27.)  The ALJ found that Plaintiff had no functional limitations in the activities of daily living and social functioning, and had no decompensation due to her depression.  (Tr. 28.)  He found that her attention and concentration were mildly impaired, but that this impairment was not severe; rather it was a "slight abnormality" that had "no more than a minimal effect" on her ability to perform basic work activities.  Bowen, 482 U.S. at 153.

The ALJ properly employed the language of 20 CFR § 404.1520a, and there is substantial evidence to support his conclusions.  The record contained scant evidence that Plaintiff's daily living or social activities were significantly affected by depression.  Likewise, decompensation was not discussed in any medical opinion or by Plaintiff.  The finding of only mildly impaired concentration accords with the medical opinion of Dr. Prabhu, the only psychiatrist who diagnosed Plaintiff with depression.  (Tr. 244.)  Dr. Prabhu found Plaintiff's mood to be depressed, but noted that her memory and concentration were "intact," and opined that she could "perform work activities on a consistent basis" and "maintain regular

United States District Court

For the Northern District of California

attendance in the workplace . . . without interruptions from her

psychiatric condition."  (Tr. 245.)

Despite Plaintiff's testimony that she was depressed and her

husband's testimony that her depression was "getting worse," the

ALJ had adequate reasons for finding that her depression was not

severe.  Beyond the objective medical evidence, their testimony

about Plaintiff's daily activities does not support a finding of

severe mental impairment.  Furthermore, Plaintiff acknowledged

that she was not seeking treatment for her depression.  (Tr.

612.)  The ALJ properly applied the special technique for

assessing mental impairment, and substantial evidence supports

his conclusion that Plaintiff does not suffer from a severe

mental impairment that would render her disabled.

IV. Credibility of Plaintiff's Pain Testimony

Plaintiff argues that the ALJ did not properly evaluate her

testimony concerning the severity of her pain.

In Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)(per

curiam), the Ninth Circuit developed a threshold test to

determine the credibility of a claimant's subjective symptom

testimony.  Under Cotton, a claimant "must produce objective

medical evidence of an underlying impairment 'which could

reasonably be expected to produce the pain or other symptoms

alleged.'"  Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.

1991) (en banc) (quoting Cotton, 799 F.2d at 1407-08); see also

Smolen, 80 F.3d at 1282.  Cotton requires "only that the causal

relationship be a reasonable inference, not a medically proven

phenomenon."  Smolen, 80 F.3d at 1282.  Therefore, a claimant is

not required to produce objective medical evidence of the pain

itself or its severity.  Id. (citing Bunnell, 947 F.2d at 347-
48).  "It is improper as a matter of law for an ALJ to discredit
excess pain testimony solely on the ground that it is not fully
corroborated by objective medical findings."  Cotton, 799 F.2d at
1407; Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989).

Once a claimant meets the Cotton test, "the Commissioner may
not discredit the claimant's testimony as to subjective symptoms
merely because they are unsupportable by objective evidence.
Unless there is affirmative evidence showing that the claimant is
malingering, the Commissioner's reason for rejecting the
claimant's testimony must be 'clear and convincing.'"  Lester, 81
F.3d at 834 (quoting Swenson v. Sullivan, 876 F.2d 683, 687 (9th
Cir. 1989)); Smolen, 80 F.3d at 1281.  When outlining the
findings supporting a conclusion that a plaintiff's testimony is
incredible, the ALJ must consider "all of the evidence" in
analyzing the severity of the claimed pain.  SSR 88-13.  Factors
to be analyzed include: (1) the nature, location, onset,
duration, frequency, radiation, and intensity of any pain;
(2) precipitating and aggravating factors; (3) type, dosage,
effectiveness and adverse side effects of any pain medications;
(4) treatment, other than medication, for relief of pain;
(5) functional restrictions; and (6) the plaintiff's daily
activities.  Id.; see Fair, 885 F.2d at 603 (types of activities
ALJ may rely on to find pain allegations credible include the
type of daily activities performed by plaintiff and whether
plaintiff sought or followed treatment); Osenbrock v. Apfel, 240
F.3d 1157, 1166 (9th Cir. 2001) (finding rejection of plaintiff's
pain testimony justified where plaintiff had little evidence of

United States District Court

For the Northern District of California

spinal abnormalities, had not used strong pain medication, had
not participated in pain management or physical therapy, and
limited daily activities by choice).

The ALJ found Plaintiff's testimony that she was precluded
from all work not "100% persuasive." (Tr. 29.) Plaintiff meets
the Cotton test in regards to her physical impairments. The
objective medical evidence strongly suggests the existence of
right carpal tunnel syndrome, bilateral upper extremity and neck
pain, and possible thoracic outlet syndrome. The ALJ accepted
these medical diagnoses. (Tr. 28-29.) Accordingly, the ALJ
cannot reject Plaintiff's testimony concerning the severity of
her pain and the limitations that it imposes merely because it is
not supported by objective medical evidence. Smolen, 80 F.3d at
1281. However, medical evidence is still relevant in determining
the severity of a plaintiff's alleged pain and its disabling
effects. 20 C.F.R. § 404.1529(c)(2); Rollins v. Massanari, 261
F.3d 853, 857 (9th Cir. 2001).

Here, although the expert opinions vary by degrees in their
assessment of Plaintiff's ability to reach, grasp, carry, and
lift, no evaluation concludes that Plaintiff is completely
incapacitated in her upper extremities. The ALJ properly
considered this medical evidence in assessing the extent of
Plaintiff's disabilities, notwithstanding her testimony that she
is incapable of all forms of work.

The ALJ highlighted objective medical evidence in the record
that was inconsistent with Plaintiff's subjective complaints. He
noted that Dr. Doyle did not find that she was precluded from
continuing work as a legal secretary, and that Dr. Huseby's RFC

United States District Court

For the Northern District of California

was consistent with the ALJ's findings.  (Tr. 28.)  The ALJ also
mentioned the nerve conduction and ulnar nerve study performed by
Dr. Spencer, who concluded that Plaintiff had good musculature,
full range of motion of the extremities, and positive Waddell
signs when testing the right grip.  (Tr. 25.)  He also pointed to
Plaintiff's activities, including walking, reading, socializing,
and participating in her children's school activities, as
evidence that she was "coping with her alleged pain" and
therefore was not totally incapable of working.  Id; see also
Fair, 885 F.2d at 603.

The ALJ did not need "clear and convincing" evidence for
discounting Plaintiff's pain testimony because there is evidence
of malingering in the record.  Smolen, 80 F.3d at 1281.  Dr.
Kneapler expressed concern over Plaintiff's "overrepresentation"
(Tr. 541.), and Dr. Spencer found positive Waddell signs and
concluded that Plaintiff's "subjective complaints are other than
the physical findings would suggest."  (Tr. 486.)  The ALJ also
noted potentially "self-interested allegations" in the context of
an ongoing worker's compensation claim.  (Tr. 29.)

Between the medical evaluations and the evidence of
malingering, substantial evidence supports the ALJ's adverse
credibility determination.  Accordingly, the ALJ's decision to
discount Plaintiff's pain testimony was not error.

V.    Plaintiff's RFC

Plaintiff argues that the ALJ's RFC determination was
improper and not based on substantial evidence.

A claimant's RFC represents the most an individual can do
despite his or her limitations.  A proper RFC assessment must

include:

> A narrative discussion describing how the evidence supports
> each conclusion, citing specific medical facts and non-
> medical evidence.  In assessing RFC, the adjudicator must
> discuss the individual's ability to perform sustained work
> activities in an ordinary work setting on a regular and
> continuing basis and describe the maximum amount of each
> work related activity the individual can perform based on
> the evidence available in the case record.  The adjudicator
> must also explain how any material inconsistencies or
> ambiguities in the evidence in the case record were
> considered and resolved.

SSR 96-8p.

Substantial evidence supports the ALJ's determination of
Plaintiff's RFC.  Her RFC included mildly impaired concentration
due to her depression.  Furthermore, the ALJ concluded that,
although Plaintiff's physical impairments were severe, she
retained the ability to: (1) perform the standing and walking
requirements of light work, (2) lift five pounds or less, and
(3) occasionally perform gross handling, fine manipulation, and
overhead reach.  (Tr. 28.)  In issuing this RFC, the ALJ resolved
the inconsistencies in the record by adopting the medical opinion
most favorable to Plaintiff, that of her treating orthopaedic
surgeon, Dr. Weiss.  Id.  Substantial evidence, both medical and
non-medical, supports the ALJ's RFC assessment.

VI.  Step Five

Plaintiff argues that the ALJ failed to meet his step five
burden of demonstrating that she could perform other work.
Specifically, Plaintiff alleges that the ALJ's hypothetical
question to the VE did not set out all of her limitations and
restrictions.

A hypothetical question posed to a vocational expert must
set out all of the claimant's limitations.  Andrews v. Shalala,

United States District Court
For the Northern District of California

53 F.3d 1035, 1044 (9th Cir. 1995).  "If the assumptions in the hypothetical are not supported by the record, the opinion of the vocational expert that claimant has a residual working capacity has no evidentiary value."  Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  However, excluding a claimant's subjective complaints in a hypothetical question posed to a VE is not improper if the ALJ makes specific findings explaining his or her rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical.  Light v. Social Sec. Admin., 119 F.3d 789, 793 (9th Cir. 1997); see also Copeland v. Bowen, 861 F.2d 536, 540 (9th Cir. 1988).  It is proper for an ALJ to limit a hypothetical to restrictions supported by substantial evidence in the record.  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).

The ALJ asked the VE to discuss employment opportunities for someone of Plaintiff's age, vocational and educational background who was unable to lift more than five pounds, could not grasp, and could only occasionally reach or engage in overhead work. (Tr. 636-37.)  This hypothetical question mirrored the ALJ's RFC assessment, discussed above, except that it omitted his finding that Plaintiff had mildly impaired concentration due to depression.  However, the ALJ later narrowed the hypothetical question to restrict lifting to only one to two pounds, and to include mildly impaired concentration.  (Tr. 639-40.)

The ALJ's hypothetical question to the VE was both appropriately constructed and properly relied upon.  The most restrictive hypothetical contained all of the limitations that were supported by substantial evidence in the record, as well as

United States District Court

For the Northern District of California

1  a lower lifting capacity than the ALJ included in his RFC.  The

2  only limitation not included was Plaintiff's testimony that she

3  was unable to perform all forms of work.  As described above, the

4  ALJ gave specific reasons supported by substantial evidence for

5  not accepting this claim.  Accordingly, the ALJ met his step five

6  burden based on the VE's expert testimony.

CONCLUSION

8  For the foregoing reasons, the Court DENIES Plaintiff'S

9  motion for summary judgment and GRANTS Defendant's cross-motion

10  for summary judgment.  Judgment shall enter accordingly.  Each

11  party shall bear her own costs.

12  IT IS SO ORDERED.



14  Dated:  4/27/07

_____
CLAUDIA WILKEN
United States District Judge